## CONNECTICUT ET AL. *v.* DOEHR

No. 90–143. Argued January 7, 1991—Decided June 6, 1991

2

4

*Henry S. Cohn*, Assistant Attorney General of Connecticut, argued the cause for petitioners. With him on the briefs were *Clarine Nardi Riddle*, Attorney General, *Arnold B. Feigin* and *Carolyn K. Querijero*, Assistant Attorneys General, and *Andrew M. Calamari*.

*Joanne S. Faulkner* argued the cause for respondent. With her on the brief were *Brian Wolfman* and *Alan B. Morrison*.*

JUSTICE WHITE delivered an opinion, Parts I, II, and III of which are the opinion of the Court.†

This case requires us to determine whether a state statute that authorizes prejudgment attachment of real estate without prior notice or hearing, without a showing of extraordinary circumstances, and without a requirement that the person seeking the attachment post a bond, satisfies the Due Process Clause of the Fourteenth Amendment. We hold that, as applied to this case, it does not.

---

*Allan B. Taylor*, *James J. Tancredi*, and *Kirk D. Tavtigian, Jr.*, filed a brief for the Connecticut Bankers Association et al. as *amici curiae* urging reversal.

†THE CHIEF JUSTICE, JUSTICE BLACKMUN, JUSTICE KENNEDY, and JUSTICE SOUTER join Parts I, II, and III of this opinion, and JUSTICE SCALIA joins Parts I and III.

## I

On March 15, 1988, petitioner John F. DiGiovanni submitted an application to the Connecticut Superior Court for an attachment in the amount of $75,000 on respondent Brian K. Doehr's home in Meriden, Connecticut. DiGiovanni took this step in conjunction with a civil action for assault and battery that he was seeking to institute against Doehr in the same court. The suit did not involve Doehr's real estate, nor did DiGiovanni have any pre-existing interest either in Doehr's home or any of his other property.

Connecticut law authorizes prejudgment attachment of real estate without affording prior notice or the opportunity for a prior hearing to the individual whose property is subject to the attachment. The State's prejudgment remedy statute provides, in relevant part:

> "The court or a judge of the court may allow the prejudgment remedy to be issued by an attorney without hearing as provided in sections 52–278c and 52–278d upon verification by oath of the plaintiff or of some competent affiant, that there is probable cause to sustain the validity of the plaintiff's claims and (1) that the prejudgment remedy requested is for an attachment of real property . . . ." Conn. Gen. Stat. § 52–278e (1991).[1]

---

[1] The complete text of § 52–278e reads:
"Allowance of prejudgment remedy without hearing. Notice to defendant. Subsequent hearing and order. Attachment of real property of municipal officers. (a) The court or a judge of the court may allow the prejudgment remedy to be issued by an attorney without hearing as provided in sections 52–278c and 52–278d upon verification by oath of the plaintiff or of some competent affiant, that there is probable cause to sustain the validity of the plaintiff's claim and (1) that the prejudgment remedy requested is for an attachment of real property; or (2) that there is reasonable likelihood that the defendant (A) neither resides in nor maintains an office or place of business in this state and is not otherwise subject to jurisdiction over his person by the court, or (B) has hidden or will hide himself so that process cannot be served on him or (C) is about to remove himself or his property from this state or (D) is about to fraudulently dispose of

6

The statute does not require the plaintiff to post a bond to insure the payment of damages that the defendant may suffer should the attachment prove wrongfully issued or the claim prove unsuccessful.

As required, DiGiovanni submitted an affidavit in support of his application. In five one-sentence paragraphs, DiGiovanni stated that the facts set forth in his previously submitted complaint were true; that "I was willfully, wantonly and maliciously assaulted by the defendant, Brian K. Doehr"; that "[s]aid assault and battery broke my left wrist and further caused an ecchymosis to my right eye, as well as other injuries"; and that "I have further expended sums of money

---

or has fraudulently disposed of any of his property with intent to hinder, delay or defraud his creditors or (E) has fraudulently hidden or withheld money, property or effects which should be liable to the satisfaction of his debts or (F) has stated he is insolvent or has stated he is unable to pay his debts as they mature.

"(b) If a prejudgment remedy is granted pursuant to this section, the plaintiff shall include in the process served on the defendant the following notice prepared by the plaintiff: YOU HAVE RIGHTS SPECIFIED IN THE CONNECTICUT GENERAL STATUTES, INCLUDING CHAPTER 903a, WHICH YOU MAY WISH TO EXERCISE CONCERNING THIS PREJUDGMENT REMEDY. THESE RIGHTS INCLUDE: (1) THE RIGHT TO A HEARING TO OBJECT TO THE PREJUDGMENT REMEDY FOR LACK OF PROBABLE CAUSE TO SUSTAIN THE CLAIM; (2) THE RIGHT TO A HEARING TO REQUEST THAT THE PREJUDGMENT REMEDY BE MODIFIED, VACATED OR DISMISSED OR THAT A BOND BE SUBSTITUTED; AND (3) THE RIGHT TO A HEARING AS TO ANY PORTION OF THE PROPERTY ATTACHED WHICH YOU CLAIM IS EXEMPT FROM EXECUTION.

"(c) The defendant appearing in such action may move to dissolve or modify the prejudgment remedy granted pursuant to this section in which event the court shall proceed to hear and determine such motion expeditiously. If the court determines at such hearing requested by the defendant that there is probable cause to sustain the validity of the plaintiff's claim, then the prejudgment remedy granted shall remain in effect. If the court determines there is no such probable cause, the prejudgment remedy shall be dissolved. An order shall be issued by the court setting forth the action it has taken."

for medical care and treatment." App. 24A. The affidavit concluded with the statement, "In my opinion, the foregoing facts are sufficient to show that there is probable cause that judgment will be rendered for the plaintiff." *Ibid.*

On the strength of these submissions the Superior Court Judge, by an order dated March 17, found "probable cause to sustain the validity of the plaintiff's claim" and ordered the attachment on Doehr's home "to the value of $75,000." The sheriff attached the property four days later, on March 21. Only after this did Doehr receive notice of the attachment. He also had yet to be served with the complaint, which is ordinarily necessary for an action to commence in Connecticut. *Young* v. *Margiotta,* 136 Conn. 429, 433, 71 A. 2d 924, 926 (1950). As the statute further required, the attachment notice informed Doehr that he had the right to a hearing: (1) to claim that no probable cause existed to sustain the claim; (2) to request that the attachment be vacated, modified, or dismissed or that a bond be substituted; or (3) to claim that some portion of the property was exempt from execution. Conn. Gen. Stat. § 52–278e(b) (1991).

Rather than pursue these options, Doehr filed suit against DiGiovanni in Federal District Court, claiming that § 52–278e (a)(1) was unconstitutional under the Due Process Clause of the Fourteenth Amendment.[2] The District Court upheld the statute and granted summary judgment in favor of DiGiovanni. *Pinsky* v. *Duncan,* 716 F. Supp. 58 (Conn. 1989). On appeal, a divided panel of the United States Court of Appeals for the Second Circuit reversed. *Pinsky* v. *Duncan,* 898 F. 2d 852 (1990).[3] Judge Pratt, who wrote the opinion

---

[2] Three other plaintiffs joined Doehr, challenging § 52–278e(a)(1) out of separate instances of attachment by different defendants. These other plaintiffs and defendants did not participate in the Court of Appeals and are no longer parties in this case.

[3] The Court of Appeals invited Connecticut to intervene pursuant to 28 U. S. C. § 2403(b) after oral argument. The State elected to intervene in the appeal and has fully participated in the proceedings before this Court.

8

for the court, concluded that the Connecticut statute violated due process in permitting *ex parte* attachment absent a showing of extraordinary circumstances. "The rule to be derived from *Sniadach* v. *Family Finance Corp. of Bay View,* 395 U. S. 337 (1969), and its progeny, therefore, is not that post-attachment hearings are generally acceptable provided that plaintiff files a factual affidavit and that a judicial officer supervises the process, but that a prior hearing may be postponed where exceptional circumstances justify such a delay, *and where* sufficient additional safeguards are present." *Id.,* at 855. This conclusion was deemed to be consistent with our decision in *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600 (1974), because the absence of a preattachment hearing was approved in that case based on the presence of extraordinary circumstances.

A further reason to invalidate the statute, the court ruled, was the highly factual nature of the issues in this case. In *Mitchell,* there were "uncomplicated matters that len[t] themselves to documentary proof" and "[t]he nature of the issues at stake minimize[d] the risk that the writ [would] be wrongfully issued by a judge." *Id.,* at 609–610. Similarly, in *Mathews* v. *Eldridge,* 424 U. S. 319, 343–344 (1976), where an evidentiary hearing was not required prior to the termination of disability benefits, the determination of disability was "sharply focused and easily documented." Judge Pratt observed that in contrast the present case involved the fact-specific event of a fist fight and the issue of assault. He doubted that the judge could reliably determine probable cause when presented with only the plaintiff's version of the altercation. "Because the risk of a wrongful attachment is considerable under these circumstances, we conclude that dispensing with notice and opportunity for a hearing until after the attachment, without a showing of extraordinary circumstances, violates the requirements of due process." 898 F. 2d, at 856. Judge Pratt went on to conclude that in his view, the statute was also constitutionally infirm for its fail-

ure to require the plaintiff to post a bond for the protection of the defendant in the event the attachment was ultimately found to have been improvident.

Judge Mahoney was also of the opinion that the statutory provision for attaching real property in civil actions, without a prior hearing and in the absence of extraordinary circumstances, was unconstitutional. He disagreed with Judge Pratt's opinion that a bond was constitutionally required. Judge Newman dissented from the holding that a hearing prior to attachment was constitutionally required and, like Judge Mahoney, disagreed with Judge Pratt on the necessity for a bond.

The dissent's conclusion accorded with the views of the Connecticut Supreme Court, which had previously upheld § 52–278e(b) in *Fermont Division, Dynamics Corp. of America* v. *Smith*, 178 Conn. 393, 423 A. 2d 80 (1979). We granted certiorari to resolve the conflict of authority. 498 U. S. 809 (1990).

## II

With this case we return to the question of what process must be afforded by a state statute enabling an individual to enlist the aid of the State to deprive another of his or her property by means of the prejudgment attachment or similar procedure. Our cases reflect the numerous variations this type of remedy can entail. In *Sniadach* v. *Family Finance Corp. of Bay View*, 395 U. S. 337 (1969), the Court struck down a Wisconsin statute that permitted a creditor to effect prejudgment garnishment of wages without notice and prior hearing to the wage earner. In *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), the Court likewise found a due process violation in state replevin provisions that permitted vendors to have goods seized through an *ex parte* application to a court clerk and the posting of a bond. Conversely, the Court upheld a Louisiana *ex parte* procedure allowing a lienholder to have disputed goods sequestered in *Mitchell* v. *W. T. Grant Co.*, *supra*. *Mitchell*, however, carefully noted that *Fuentes* was

decided against "a factual and legal background sufficiently different . . . that it does not require the invalidation of the Louisiana sequestration statute." *Id.*, at 615. Those differences included Louisiana's provision of an immediate postdeprivation hearing along with the option of damages; the requirement that a judge rather than a clerk determine that there is a clear showing of entitlement to the writ; the necessity for a detailed affidavit; and an emphasis on the lienholder's interest in preventing waste or alienation of the encumbered property. *Id.*, at 615–618. In *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U. S. 601 (1975), the Court again invalidated an *ex parte* garnishment statute that not only failed to provide for notice and prior hearing but also failed to require a bond, a detailed affidavit setting out the claim, the determination of a neutral magistrate, or a prompt postdeprivation hearing. *Id.*, at 606–608.

These cases "underscore the truism that '"[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Mathews* v. *Eldridge, supra*, at 334 (quoting *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 895 (1961)). In *Mathews*, we drew upon our prejudgment remedy decisions to determine what process is due when the government itself seeks to effect a deprivation on its own initiative. 424 U. S., at 334. That analysis resulted in the now familiar threefold inquiry requiring consideration of "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and lastly "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*, at 335.

Here the inquiry is similar, but the focus is different. Prejudgment remedy statutes ordinarily apply to disputes between private parties rather than between an individual and

the government. Such enactments are designed to enable one of the parties to "make use of state procedures with the overt, significant assistance of state officials," and they undoubtedly involve state action "substantial enough to implicate the Due Process Clause." *Tulsa Professional Collection Services, Inc.* v. *Pope*, 485 U. S. 478, 486 (1988). Nonetheless, any burden that increasing procedural safeguards entails primarily affects not the government, but the party seeking control of the other's property. See *Fuentes* v. *Shevin, supra*, at 99–101 (WHITE, J., dissenting). For this type of case, therefore, the relevant inquiry requires, as in *Mathews*, first, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, in contrast to *Mathews*, principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections.

We now consider the *Mathews* factors in determining the adequacy of the procedures before us, first with regard to the safeguards of notice and a prior hearing, and then in relation to the protection of a bond.

### III

We agree with the Court of Appeals that the property interests that attachment affects are significant. For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause. Nor does Connecticut deny that any of these consequences occurs.

12

Instead, the State correctly points out that these effects do not amount to a complete, physical, or permanent deprivation of real property; their impact is less than the perhaps temporary total deprivation of household goods or wages. See *Sniadach, supra,* at 340; *Mitchell,* 416 U. S., at 613. But the Court has never held that only such extreme deprivations trigger due process concern. See *Buchanan* v. *Warley,* 245 U. S. 60, 74 (1917). To the contrary, our cases show that even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection. Without doubt, state procedures for creating and enforcing attachments, as with liens, "are subject to the strictures of due process." *Peralta* v. *Heights Medical Center, Inc.,* 485 U. S. 80, 85 (1988) (citing *Mitchell, supra,* at 604; *Hodge* v. *Muscatine County,* 196 U. S. 276, 281 (1905)).[4]

We also agree with the Court of Appeals that the risk of erroneous deprivation that the State permits here is substantial. By definition, attachment statutes premise a deprivation of property on one ultimate factual contingency—the award of damages to the plaintiff which the defendant may not be able to satisfy. See *Ownbey* v. *Morgan,* 256 U. S. 94, 104–105 (1921); R. Thompson & J. Sebert, Remedies: Damages, Equity and Restitution § 5.01 (1983). For attachments

---

[4] Our summary affirmance in *Spielman-Fond, Inc.* v. *Hanson's, Inc.,* 417 U. S. 901 (1974), does not control. In *Spielman-Fond,* the District Court held that the filing of a mechanic's lien did not amount to the taking of a significant property interest. 379 F. Supp. 997, 999 (Ariz. 1973) (three-judge court) *(per curiam).* A summary disposition does not enjoy the full precedential value of a case argued on the merits and disposed of by a written opinion. *Edelman* v. *Jordan,* 415 U. S. 651, 671 (1974). The facts of *Spielman-Fond* presented an alternative basis for affirmance in any event. Unlike the case before us, the mechanic's lien statute in *Spielman-Fond* required the creditor to have a pre-existing interest in the property at issue. 379 F. Supp., at 997. As we explain below, a heightened plaintiff interest in certain circumstances can provide a ground for upholding procedures that are otherwise suspect. *Infra,* at 15.

before judgment, Connecticut mandates that this determination be made by means of a procedural inquiry that asks whether "there is probable cause to sustain the validity of the plaintiff's claim." Conn. Gen. Stat. § 52–278e(a) (1991). The statute elsewhere defines the validity of the claim in terms of the likelihood "that judgment will be rendered in the matter in favor of the plaintiff." Conn. Gen. Stat. § 52–278c(a)(2) (1991); *Ledgebrook Condominium Assn.* v. *Lusk Corp.*, 172 Conn. 577, 584, 376 A. 2d 60, 63–64 (1977). What probable cause means in this context, however, remains obscure. The State initially took the position, as did the dissent below, that the statute requires a plaintiff to show the objective likelihood of the suit's success. Brief for Petitioners 12; *Pinsky*, 898 F. 2d, at 861–862 (Newman, J., dissenting). Doehr, citing ambiguous state cases, reads the provision as requiring no more than that a plaintiff demonstrate a subjective good-faith belief that the suit will succeed. Brief for Respondent 25–26. *Ledgebrook Condominium Assn.*, *supra*, at 584, 376 A. 2d, at 63–64; *Anderson* v. *Nedovich*, 19 Conn. App. 85, 88, 561 A. 2d 948, 949 (1989). At oral argument, the State shifted its position to argue that the statute requires something akin to the plaintiff stating a claim with sufficient facts to survive a motion to dismiss.

We need not resolve this confusion since the statute presents too great a risk of erroneous deprivation under any of these interpretations. If the statute demands inquiry into the sufficiency of the complaint, or, still less, the plaintiff's good-faith belief that the complaint is sufficient, requirement of a complaint and a factual affidavit would permit a court to make these minimal determinations. But neither inquiry adequately reduces the risk of erroneous deprivation. Permitting a court to authorize attachment merely because the plaintiff believes the defendant is liable, or because the plaintiff can make out a facially valid complaint, would permit the deprivation of the defendant's property when the claim would fail to convince a jury, when it rested on factual allegations

that were sufficient to state a cause of action but which the defendant would dispute, or in the case of a mere good-faith standard, even when the complaint failed to state a claim upon which relief could be granted. The potential for unwarranted attachment in these situations is self-evident and too great to satisfy the requirements of due process absent any countervailing consideration.

Even if the provision requires the plaintiff to demonstrate, and the judge to find, probable cause to believe that judgment will be rendered in favor of the plaintiff, the risk of error was substantial in this case. As the record shows, and as the State concedes, only a skeletal affidavit need be, and was, filed. The State urges that the reviewing judge normally reviews the complaint as well, but concedes that the complaint may also be conclusory. It is self-evident that the judge could make no realistic assessment concerning the likelihood of an action's success based upon these one-sided, self-serving, and conclusory submissions. And as the Court of Appeals said, in a case like this involving an alleged assault, even a detailed affidavit would give only the plaintiff's version of the confrontation. Unlike determining the existence of a debt or delinquent payments, the issue does not concern "ordinarily uncomplicated matters that lend themselves to documentary proof." *Mitchell*, 416 U. S., at 609. The likelihood of error that results illustrates that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights . . . . [And n]o better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 170–172 (1951) (Frankfurter, J., concurring).

What safeguards the State does afford do not adequately reduce this risk. Connecticut points out that the statute also provides an "expeditiou[s]" postattachment adversary hear-

ing, § 52–278e(c);[5] notice for such a hearing, § 52–278e(b); judicial review of an adverse decision, § 52–278l(a); and a double damages action if the original suit is commenced without probable cause, § 52–568(a)(1). Similar considerations were present in *Mitchell*, where we upheld Louisiana's sequestration statute despite the lack of predeprivation notice and hearing. But in *Mitchell*, the plaintiff had a vendor's lien to protect, the risk of error was minimal because the likelihood of recovery involved uncomplicated matters that lent themselves to documentary proof, 416 U. S., at 609–610, and the plaintiff was required to put up a bond. None of these factors diminishing the need for a predeprivation hearing is present in this case. It is true that a later hearing might negate the presence of probable cause, but this would not cure the temporary deprivation that an earlier hearing might have prevented. "The Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause." *Fuentes*, 407 U. S., at 86.

---

[5] The parties vigorously dispute whether a defendant can in fact receive a prompt hearing. Doehr contends that the State's rules of practice prevent the filing of any motion—including a motion for the mandated postattachment hearing—until the return date on the complaint, which in this case was 30 days after service. Connecticut Practice Book § 114 (1988). Under state law at least 12 days must elapse between service on the defendant and the return date. Conn. Gen. Stat. § 52–46 (1991). The State counters that the postattachment hearing is available upon request. See *Fermont Division, Dynamics Corp. of America* v. *Smith*, 178 Conn. 393, 397–398, 423 A. 2d 80, 83 (1979) ("Most important, the statute affords to the defendant whose property has been attached the opportunity to obtain an immediate postseizure hearing at which the prejudgment remedy will be dissolved unless the moving party proves probable cause to sustain the validity of his claim"). We assume, without deciding, that the hearing is prompt. Even on this assumption, the State's procedures fail to provide adequate safeguards against the erroneous deprivation of the property interest at stake.

16

Finally, we conclude that the interests in favor of an *ex parte* attachment, particularly the interests of the plaintiff, are too minimal to supply such a consideration here. The plaintiff had no existing interest in Doehr's real estate when he sought the attachment. His only interest in attaching the property was to ensure the availability of assets to satisfy his judgment if he prevailed on the merits of his action. Yet there was no allegation that Doehr was about to transfer or encumber his real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment. Our cases have recognized such a properly supported claim would be an exigent circumstance permitting postponing any notice or hearing until after the attachment is effected. See *Mitchell, supra,* at 609; *Fuentes, supra,* at 90–92; *Sniadach,* 395 U. S., at 339. Absent such allegations, however, the plaintiff's interest in attaching the property does not justify the burdening of Doehr's ownership rights without a hearing to determine the likelihood of recovery.

No interest the government may have affects the analysis. The State's substantive interest in protecting any rights of the plaintiff cannot be any more weighty than those rights themselves. Here the plaintiff's interest is *de minimis*. Moreover, the State cannot seriously plead additional financial or administrative burdens involving predeprivation hearings when it already claims to provide an immediate post-deprivation hearing. Conn. Gen. Stat. §§ 52–278e(b) and (c) (1991); *Fermont,* 178 Conn., at 397–398, 423 A. 2d, at 83.

Historical and contemporary practices support our analysis. Prejudgment attachment is a remedy unknown at common law. Instead, "it traces its origin to the Custom of London, under which a creditor might attach money or goods of the defendant either in the plaintiff's own hands or in the custody of a third person, by proceedings in the mayor's court or in the sheriff's court." *Ownbey,* 256 U. S., at 104. Generally speaking, attachment measures in both England and this

country had several limitations that reduced the risk of erroneous deprivation which Connecticut permits. Although attachments ordinarily did not require prior notice or a hearing, they were usually authorized only where the defendant had taken or threatened to take some action that would place the satisfaction of the plaintiff's potential award in jeopardy. See C. Drake, Law of Suits by Attachment, §§ 40–82 (1866) (hereinafter Drake); 1 R. Shinn, Attachment and Garnishment § 86 (1896) (hereinafter Shinn). Attachments, moreover, were generally confined to claims by creditors. Drake §§ 9–10; Shinn § 12. As we and the Court of Appeals have noted, disputes between debtors and creditors more readily lend themselves to accurate *ex parte* assessments of the merits. Tort actions, like the assault and battery claim at issue here, do not. See *Mitchell, supra*, at 609–610. Finally, as we will discuss below, attachment statutes historically required that the plaintiff post a bond. Drake §§ 114–183; Shinn § 153.

Connecticut's statute appears even more suspect in light of current practice. A survey of state attachment provisions reveals that nearly every State requires either a preattachment hearing, a showing of some exigent circumstance, or both, before permitting an attachment to take place. See Appendix to this opinion. Twenty-seven States, as well as the District of Columbia, permit attachments only when some extraordinary circumstance is present. In such cases, preattachment hearings are not required but postattachment hearings are provided. Ten States permit attachment without the presence of such factors but require prewrit hearings unless one of those factors is shown. Six States limit attachments to extraordinary circumstance cases, but the writ will not issue prior to a hearing unless there is a showing of some even more compelling condition.[6] Three States always require a

---

[6] One State, Pennsylvania, has not had an attachment statute or rule since the decision in *Jonnet* v. *Dollar Savings Bank of New York City*, 530 F. 2d 1123 (CA3 1976).

preattachment hearing. Only Washington, Connecticut, and Rhode Island authorize attachments without a prior hearing in situations that do not involve any purportedly heightened threat to the plaintiff's interests. Even those States permit *ex parte* deprivations only in certain types of cases: Rhode Island does so only when the claim is equitable; Connecticut and Washington do so only when real estate is to be attached, and even Washington requires a bond. Conversely, the States for the most part no longer confine attachments to creditor claims. This development, however, only increases the importance of the other limitations.

We do not mean to imply that any given exigency requirement protects an attachment from constitutional attack. Nor do we suggest that the statutory measures we have surveyed are necessarily free of due process problems or other constitutional infirmities in general. We do believe, however, that the procedures of almost all the States confirm our view that the Connecticut provision before us, by failing to provide a preattachment hearing without at least requiring a showing of some exigent circumstance, clearly falls short of the demands of due process.

## IV

### A

Although a majority of the Court does not reach the issue, JUSTICES MARSHALL, STEVENS, O'CONNOR, and I deem it appropriate to consider whether due process also requires the plaintiff to post a bond or other security in addition to requiring a hearing or showing of some exigency.[7]

---

[7] Ordinarily we will not address a contention advanced by a respondent that would enlarge his or her rights under a judgment, without the respondent filing a cross-petition for certiorari. *E. g., Trans World Airlines, Inc.* v. *Thurston,* 469 U. S. 111, 119, n. 14 (1985). Here the Court of Appeals rejected Doehr's argument that § 52–278e(a)(1) violates due process in failing to mandate a preattachment bond. Nonetheless, this case involves considerations that in the past have prompted us "to consider the question highlighted by respondent." *Berkemer* v. *McCarty,* 468

As noted, the impairments to property rights that attachments effect merit due process protection. Several consequences can be severe, such as the default of a homeowner's mortgage. In the present context, it need only be added that we have repeatedly recognized the utility of a bond in protecting property rights affected by the mistaken award of prejudgment remedies. *Di-Chem*, 419 U. S., at 610, 611 (Powell, J., concurring in judgment); *id.*, at 619 (BLACKMUN, J., dissenting); *Mitchell*, 416 U. S., at 606, n. 8.

Without a bond, at the time of attachment, the danger that these property rights may be wrongfully deprived remains unacceptably high even with such safeguards as a hearing or exigency requirement. The need for a bond is especially apparent where extraordinary circumstances justify an attachment with no more than the plaintiff's *ex parte* assertion of a claim. We have already discussed how due process tolerates, and the States generally permit, the otherwise impermissible chance of erroneously depriving the defendant in such situations in light of the heightened interest of the plaintiff. Until a postattachment hearing, however, a defendant has no protection against damages sustained where no extraordinary circumstance in fact existed or the plaintiff's likelihood of recovery was nil. Such protection is what a bond can supply. Both the Court and its individual Members have repeatedly found the requirement of a bond to play an essential role in reducing what would have been too great a degree of risk in precisely this type of circumstance. *Mitchell*,

---

U. S. 420, 435–436, n. 23 (1984). First, as our cases have shown, the notice and hearing question and the bond question are intertwined and can fairly be considered facets of the same general issue. Thus, "[w]ithout undue strain, the position taken by respondent before this Court . . . might be characterized as an argument in support of the judgment below" insofar as a discussion of notice and a hearing cannot be divorced from consideration of a bond. *Ibid.* Second, this aspect of prejudgment attachment "plainly warrants our attention, and with regard to which the lower courts are in need of guidance." *Ibid.* Third, "and perhaps most importantly, both parties have briefed and argued the question." *Ibid.*

*supra*, at 610, 619; *Di-Chem*, 419 U. S., at 613 (Powell, J., concurring in judgment); *id.*, at 619 (BLACKMUN, J., dissenting); *Fuentes*, 407 U. S., at 101 (WHITE, J., dissenting).

But the need for a bond does not end here. A defendant's property rights remain at undue risk even when there has been an adversarial hearing to determine the plaintiff's likelihood of recovery. At best, a court's initial assessment of each party's case cannot produce more than an educated prediction as to who will win. This is especially true when, as here, the nature of the claim makes any accurate prediction elusive. See *Mitchell, supra,* at 609–610. In consequence, even a full hearing under a proper probable-cause standard would not prevent many defendants from having title to their homes impaired during the pendency of suits that never result in the contingency that ultimately justifies such impairment, namely, an award to the plaintiff. Attachment measures currently on the books reflect this concern. All but a handful of States require a plaintiff's bond despite also affording a hearing either before, or (for the vast majority, only under extraordinary circumstances) soon after, an attachment takes place. See Appendix to this opinion. Bonds have been a similarly common feature of other prejudgment remedy procedures that we have considered, whether or not these procedures also included a hearing. See *Ownbey*, 256 U. S., at 101–102, n. 1; *Fuentes, supra,* at 73, n. 6, 75–76, n. 7, 81–82; *Mitchell, supra,* at 606, and n. 6; *Di-Chem, supra,* at 602–603, n. 1, 608.

The State stresses its double damages remedy for suits that are commenced without probable cause. Conn. Gen. Stat. § 52–568(a)(1).[8] This remedy, however, fails to make

---

[8] Section 52–568(a)(1) provides:

"Any person who commences and prosecutes any civil action or complaint against another, in his own name, or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double dam-

up for the lack of a bond. As an initial matter, the meaning of "probable cause" in this provision is no more clear here than it was in the attachment provision itself. Should the term mean the plaintiff's good faith or the facial adequacy of the complaint, the remedy is clearly insufficient. A defendant who was deprived where there was little or no likelihood that the plaintiff would obtain a judgment could nonetheless recover only by proving some type of fraud or malice or by showing that the plaintiff had failed to state a claim. Problems persist even if the plaintiff's ultimate failure permits recovery. At best a defendant must await a decision on the merits of the plaintiff's complaint, even assuming that a § 52–568(a)(1) action may be brought as a counterclaim. *Hydro Air of Connecticut, Inc.* v. *Versa Technologies, Inc.*, 99 F. R. D. 111, 113 (Conn. 1983). Settlement, under Connecticut law, precludes seeking the damages remedy, a fact that encourages the use of attachments as a tactical device to pressure an opponent to capitulate. *Blake* v. *Levy*, 191 Conn. 257, 464 A. 2d 52 (1983). An attorney's advice that there is probable cause to commence an action constitutes a complete defense, even if the advice was unsound or erroneous. *Vandersluis* v. *Weil*, 176 Conn. 353, 361, 407 A. 2d 982, 987 (1978). Finally, there is no guarantee that the original plaintiff will have adequate assets to satisfy an award that the defendant may win.

Nor is there any appreciable interest against a bond requirement. Section 52–278e(a)(1) does not require a plaintiff to show exigent circumstances nor any pre-existing interest in the property facing attachment. A party must show more than the mere existence of a claim before subjecting an opponent to prejudgment proceedings that carry a significant risk of erroneous deprivation. See *Mitchell, supra,* at 604–609; *Fuentes, supra,* at 90–92; *Sniadach,* 395 U. S., at 339.

---

ages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

B

Our foregoing discussion compels the four of us to consider whether a bond excuses the need for a hearing or other safeguards altogether. If a bond is needed to augment the protections afforded by preattachment and postattachment hearings, it arguably follows that a bond renders these safeguards unnecessary. That conclusion is unconvincing, however, for it ignores certain harms that bonds could not undo but that hearings would prevent. The law concerning attachments has rarely, if ever, required defendants to suffer an encumbered title until the case is concluded without any prior opportunity to show that the attachment was unwarranted. Our cases have repeatedly emphasized the importance of providing a prompt postdeprivation hearing at the very least. *Mitchell*, 416 U. S., at 606; *Di-Chem*, 419 U. S., at 606–607. Every State but one, moreover, expressly requires a preattachment or postattachment hearing to determine the propriety of an attachment.

The necessity for at least a prompt postattachment hearing is self-evident because the right to be compensated at the end of the case, if the plaintiff loses, for all provable injuries caused by the attachment is inadequate to redress the harm inflicted, harm that could have been avoided had an early hearing been held. An individual with an immediate need or opportunity to sell a property can neither do so, nor otherwise satisfy that need or recreate the opportunity. The same applies to a parent in need of a home equity loan for a child's education, an entrepreneur seeking to start a business on the strength of an otherwise strong credit rating, or simply a homeowner who might face the disruption of having a mortgage placed in technical default. The extent of these harms, moreover, grows with the length of the suit. Here, oral argument indicated that civil suits in Connecticut commonly take up to four to seven years for completion. Tr. of Oral Arg. 44. Many state attachment statutes require

that the amount of a bond be anywhere from the equivalent to twice the amount the plaintiff seeks. See, *e. g.*, Utah Rule of Civ. Proc. 64C(b). These amounts bear no relation to the harm the defendant might suffer even assuming that money damages can make up for the foregoing disruptions. It should be clear, however, that such an assumption is fundamentally flawed. Reliance on a bond does not sufficiently account for the harms that flow from an erroneous attachment to excuse a State from reducing that risk by means of a timely hearing.

If a bond cannot serve to dispense with a hearing immediately after attachment, neither is it sufficient basis for not providing a preattachment hearing in the absence of exigent circumstances even if in any event a hearing would be provided a few days later. The reasons are the same: a wrongful attachment can inflict injury that will not fully be redressed by recovery on the bond after a prompt postattachment hearing determines that the attachment was invalid.

Once more, history and contemporary practices support our conclusion. Historically, attachments would not issue without a showing of extraordinary circumstances even though a plaintiff bond was almost invariably required in addition. Drake §§ 4, 114; Shinn §§ 86, 153. Likewise, all but eight States currently require the posting of a bond. Out of this 42-State majority, all but one requires a preattachment hearing, a showing of some exigency, or both, and all but one expressly require a postattachment hearing when an attachment has been issued *ex parte*. See Appendix to this opinion. This testimony underscores the point that neither a hearing nor an extraordinary circumstance limitation eliminates the need for a bond, no more than a bond allows waiver of these other protections. To reconcile the interests of the defendant and the plaintiff accurately, due process generally requires all of the above.

## V

Because Connecticut's prejudgment remedy provision, Conn. Gen. Stat. § 52–278e(a)(1), violates the requirements of due process by authorizing prejudgment attachment without prior notice or a hearing, the judgment of the Court of Appeals is affirmed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

### Prejudgment Attachment Statutes

| | Preattach. Hrg. Required Unless Exigent Circs. | Attachment Only in Exigent Circs.; No Preattach. Hrg. Required | Preattach. Hrg. Even in Most Exigent Circs. | Bond Required | Postattach. Hrg. Required |
|---|---|---|---|---|---|
| Alabama | | X | | X | X |
| Alaska | Preattachment hrg. always required. | | | X | |
| Arizona | X | | | X | X |
| Arkansas | | X | | X | X |
| California | X | | | X | X |
| Colorado | | X | | X | X |
| Connecticut | X (or unless attachment of real estate) | | | | X |
| Delaware | | X | | X | X |
| DC | | X | | X | X |
| Florida | | X | | X | X |
| Georgia | | X | | X | X |
| Hawaii | Preattachment hrg. always required. | | | X | X |
| Idaho | X | | | X | X |
| Illinois | | X | | X | X |
| Indiana | | X | | X | X |
| Iowa | | X | | X | X |
| Kansas | | X | | X | X |
| Kentucky | | | X | X | |
| Louisiana | | X | | X | X |

| | Preattach. Hrg. Required Unless Exigent Circs. | Attachment Only in Exigent Circs.; No Preattach. Hrg. Required | Preattach. Hrg. Even in Most Exigent Circs. | Bond Required | Postattach. Hrg. Required |
|---|---|---|---|---|---|
| Maine | X | | | | X |
| Maryland | | X | | X | X |
| Massachusetts | X | | | x/o[1] | X |
| Michigan | | X | | | X |
| Minnesota | | | X | X | X |
| Mississippi | | X | | X | X |
| Missouri | | X | | X | X |
| Montana | | X | | X | X |
| Nebraska | | X | | X | X |
| Nevada | X | | | X | X |
| New Hampshire | X | | | | X |
| New Jersey | X | | | x/o | X |
| New Mexico | | X | | X | X |
| New York | | X | | X | X |
| North Carolina | | X | | X | X |
| North Dakota | | X | | X | X |
| Ohio | | | X | X | X |
| Oklahoma | X | | | X | X |
| Oregon | Preattachment hrg. always required. | | X | | |
| Pennsylvania | Rescinded in light of 530 F. 2d 1123 (CA3 1976). | | | | |
| Rhode Island | X (but not if equitable claim) | | | x/o | |
| South Carolina | | X | | X | X |
| South Dakota | | X | | X | X |
| Tennessee | | X | | X | X[2] |
| Texas | | | X | X | X |
| Utah | | | X | X | X |
| Vermont | X | | | | X |

[1] An "x/o" in the "Bond Required" column indicates that a bond may be required at the discretion of the court.

[2] The court may, under certain circumstances, quash the attachment at the defendant's request without a hearing.

| | Preattach. Hrg. Required Unless Exigent Circs. | Attachment Only in Exigent Circs.; No Preattach. Hrg. Required | Preattach. Hrg. Even in Most Exigent Circs. | Bond Required | Postattach. Hrg. Required |
|---|:---:|:---:|:---:|:---:|:---:|
| Virginia | X | | X | X | |
| Washington | | X | X[3] | X | |
| | | (except for real estate on a contract claim) | | | |
| West Virginia | X | | X | X | |
| Wisconsin | X | | X | X | |
| Wyoming | | X | X | X | |

[3] A bond is required except in situations in which the plaintiff seeks to attach the real property of a defendant who, after diligent efforts, cannot be served.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE BLACKMUN joins, concurring in part and concurring in the judgment.

I agree with the Court that the Connecticut attachment statute, "as applied to this case," *ante*, at 4, fails to satisfy the Due Process Clause of the Fourteenth Amendment. I therefore join Parts I, II, and III of its opinion. Unfortunately, the remainder of the opinion does not confine itself to the facts of this case, but enters upon a lengthy disquisition as to what combination of safeguards are required to satisfy due process in hypothetical cases not before the Court. I therefore do not join Part IV.

As the Court's opinion points out, the Connecticut statute allows attachment not merely for a creditor's claim, but for a tort claim of assault and battery; it affords no opportunity for a predeprivation hearing; it contains no requirement that there be "exigent circumstances," such as an effort on the part of the defendant to conceal assets; no bond is required from the plaintiff; and the property attached is one in which the plaintiff has no pre-existing interest. The Court's opin-

ion is, in my view, ultimately correct when it bases its holding of unconstitutionality of the Connecticut statute as applied here on our cases of *Sniadach* v. *Family Finance Corp. of Bay View*, 395 U. S. 337 (1969); *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600 (1974), and *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U. S. 601 (1975). But I do not believe that the result follows so inexorably as the Court's opinion suggests. All of the cited cases dealt with personalty—bank deposits or chattels—and each involved the physical seizure of the property itself, so that the defendant was deprived of its use. These cases, which represented something of a revolution in the jurisprudence of procedural due process, placed substantial limits on the methods by which creditors could obtain a lien on the assets of a debtor prior to judgment. But in all of them the debtor was deprived of the use and possession of the property. In the present case, on the other hand, Connecticut's prejudgment attachment on real property statute, which secures an incipient lien for the plaintiff, does not deprive the defendant of the use or possession of the property.

The Court's opinion therefore breaks new ground, and I would point out, more emphatically than the Court does, the limits of today's holding. In *Spielman-Fond, Inc.* v. *Hanson's, Inc.*, 379 F. Supp. 997, 999 (Ariz. 1973), the District Court held that the filing of a mechanics' lien did not cause the deprivation of a significant property interest of the owner. We summarily affirmed that decision. 417 U. S. 901 (1974). Other courts have read this summary affirmance to mean that the mere imposition of a lien on real property, which does not disturb the owner's use or enjoyment of the property, is not a deprivation of property calling for procedural due process safeguards. I agree with the Court, however, that upon analysis the deprivation here is a significant one, even though the owner remains in undisturbed possession. "For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise

alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." *Ante*, at 11. Given the elaborate system of title records relating to real property which prevails in all of our States, a lienor need not obtain possession or use of real property belonging to a debtor in order to significantly impair its value to him.

But in *Spielman-Fond, Inc.*, *supra*, there was, as the Court points out, *ante*, at 12, n. 4, an alternative basis available to this Court for affirmance of that decision. Arizona recognized a pre-existing lien in favor of unpaid mechanics and materialmen who had contributed labor or supplies which were incorporated in improvements to real property. The existence of such a lien upon the very property ultimately posted or noticed distinguishes those cases from the present one, where the plaintiff had no pre-existing interest in the real property which he sought to attach. Materialman's and mechanic's lien statutes award an interest in real property to workers who have contributed their labor, and to suppliers who have furnished material, for the improvement of the real property. Since neither the labor nor the material can be reclaimed once it has become a part of the realty, this is the only method by which workmen or small businessmen who have contributed to the improvement of the property may be given a remedy against a property owner who has defaulted on his promise to pay for the labor and the materials. To require any sort of a contested court hearing or bond before the notice of lien takes effect would largely defeat the purpose of these statutes.

Petitioners in their brief rely in part on our summary affirmance in *Bartlett* v. *Williams*, 464 U. S. 801 (1983). That case involved a *lis pendens*, in which the question presented to this Court was whether such a procedure could be valid when the only protection afforded to the owner of land affected by the *lis pendens* was a postsequestration hearing.

A notice of *lis pendens* is a well-established, traditional remedy whereby a plaintiff (usually a judgment creditor) who brings an action to enforce an interest in property to which the defendant has title gives notice of the pendency of such action to third parties; the notice causes the interest which he establishes, if successful, to relate back to the date of the filing of the *lis pendens*. The filing of such notice will have an effect upon the defendant's ability to alienate the property, or to obtain additional security on the basis of title to the property, but the effect of the *lis pendens* is simply to give notice to the world of the remedy being sought in the lawsuit itself. The *lis pendens* itself creates no additional right in the property on the part of the plaintiff, but simply allows third parties to know that a lawsuit is pending in which the plaintiff is seeking to establish such a right. Here, too, the fact that the plaintiff already claims an interest in the property which he seeks to enforce by a lawsuit distinguishes this class of cases from the Connecticut attachment employed in the present case.

Today's holding is a significant development in the law; the only cases dealing with real property cited in the Court's opinion, *Peralta* v. *Heights Medical Center, Inc.*, 485 U. S. 80, 85 (1988), and *Hodge* v. *Muscatine County*, 196 U. S. 276, 281 (1905), arose out of lien foreclosure sales in which the question was whether the owner was entitled to proper notice. The change is dramatically reflected when we compare today's decision with the almost casual statement of Justice Holmes, writing for a unanimous Court in *Coffin Brothers & Co.* v. *Bennett*, 277 U. S. 29, 31 (1928):

> "[N]othing is more common than to allow parties alleging themselves to be creditors to establish in advance by attachment a lien dependent for its effect upon the result of the suit."

The only protection accorded to the debtor in that case was the right to contest his liability in a postdeprivation proceeding.

It is both unwise and unnecessary, I believe, for the plurality to proceed, as it does in Part IV, from its decision of the case before it to discuss abstract and hypothetical situations not before it. This is especially so where we are dealing with the Due Process Clause which, as the Court recognizes, " " "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances," " " *ante*, at 10. And it is even more true in a case involving constitutional limits on the methods by which the States may transfer or create interests in real property; in other areas of the law, dicta may do little damage, but those who insure titles or write title opinions often do not enjoy the luxury of distinguishing detween dicta and holding.

The two elements of due process with which the Court concerns itself in Part IV—the requirements of a bond and of "exigent circumstances"—prove to be upon analysis so vague that the discussion is not only unnecessary, but not particularly useful. Unless one knows what the terms and conditions of a bond are to be, the requirement of a "bond" in the abstract means little. The amount to be secured by the bond and the conditions of the bond are left unaddressed—is there to be liability on the part of a plaintiff if he is ultimately unsuccessful in the underlying lawsuit, or is it instead to be conditioned on some sort of good-faith test? The "exigent circumstances" referred to by the Court are admittedly equally vague; nonresidency appears to be enough in some States, an attempt to conceal assets is required in others, an effort to flee the jurisdiction in still others. We should await concrete cases which present questions involving bonds and exigent circumstances before we attempt to decide when and if the Due Process Clause of the Fourteenth Amendment requires them as prerequisites for a lawful attachment.

JUSTICE SCALIA, concurring in part and concurring in the judgment.

Since the manner of attachment here was not a recognized procedure at common law, cf. *Pacific Mut. Life Ins. Co.* v.

*Haslip,* 499 U. S. 1, 24 (1991) (SCALIA, J., concurring in judgment), I agree that its validity under the Due Process Clause should be determined by applying the test we set forth in *Mathews* v. *Eldridge,* 424 U. S. 319 (1976); and I agree that it fails that test. I join Parts I and III of the Court's opinion, and concur in the judgment of the Court.